UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE GTX, INC. SHAREHOLDERS LITIGATION | Lead Case No. 1:19-cv-03239 |
| | CLASS ACTION |

**REDACTED - PUBLIC VERSION**

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Lead Plaintiffs Nabil Barakat and Michael Cooper ("Plaintiffs"), through their undersigned counsel, allege upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.      This action is brought as a class action by Plaintiffs on behalf of themselves and the pre-Merger (as defined below) holders of the common stock of GTx, Inc. ("GTx" or the "Company") (other than Defendants outlined below) against the Company and its pre-Merger Board of Directors (the "Board" or "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") in connection with the merger between GTx and Oncternal Therapeutics, Inc. ("Oncternal").

2.      On March 6, 2019, the Board approved the terms of and caused the Company to enter into an agreement and plan of merger, which was subsequently amended on April 30, 2019 (the "Merger Agreement"), pursuant to which Grizzly Merger Sub, Inc., a wholly-owned subsidiary of GTx ("Merger Sub"), would merge with and into Oncternal, with Oncternal surviving as a wholly-owned subsidiary of GTx (the "Merger" or "Transaction").

3.      The GTx shareholder vote in connection with the Merger occurred on June 5, 2019. Notably, despite the fact that (a) there were 24,051,844 outstanding shares of GTx common stock

entitled to vote on the Merger and (b) stockholders of GTx who signed voting agreements with Oncternal to vote in favor of the Merger owned an aggregate of 10,938,824 of those shares (representing approximately 45% of the outstanding shares of GTx's common stock), only 13,482,573 votes were cast in favor of the Merger.  That means that, excluding the stockholders that signed voting agreements with Oncternal (many of whom were or were affiliated with Company insiders), only 2,543,749 of the Company's remaining 13,113,020 public shares – *i.e.*, less than 20% – were voted in favor of the Merger.

4.    The Merger closed on June 7, 2019. The combined company now operates under the name "Oncternal Therapeutics, Inc." and its shares trade on the Nasdaq stock exchange under the ticker symbol "ONCT."

5.    While the Merger technically resulted in the acquisition of Oncternal by GTx, in reality, it was a takeover of GTx by Oncternal. That is because, pursuant to the terms of the Merger Agreement, at the time of the consummation, each share of Oncternal common stock was converted into the right to receive approximately 0.5137 shares of GTx's common stock (the "Merger Consideration").  As a result, at the conclusion of the Merger – according to the Proxy (defined below) at least – the former stockholders of pre-Merger Oncternal were supposed to hold approximately 77.5% of the outstanding shares of common stock of the combined company, while GTx's pre-Merger stockholders were supposed to retain a mere 22.5% of the outstanding shares of common stock of the combined company. ███████████████████████████████████ ███████████████████████████████████████████████████████████

6.    In order to convince GTx's pre-Merger stockholders to vote in favor of the Merger, on or about May 7, 2019, the Board authorized the filing of a materially incomplete and false and/or misleading Form 424B3 proxy statement/prospectus/information statement (the "Proxy")

with the Securities and Exchange Commission ("SEC"), which contained, in violation of Sections

14(a) and 20(a) of the Exchange Act, incomplete and materially misleading information regarding



[1] Specifically, the Proxy

represented to pre-Merger GTx shareholders that, after the Merger, the former stockholders of pre-

Merger Oncternal would hold approximately 77.5% of the outstanding shares of common stock of

the combined company, while GTx's pre-Merger stockholders would retain a mere 22.5% of the

outstanding shares of common stock of the combined company.

based solely

on the $129 million market capitalization of the combined company on June 7, 2019, the date of

the closing of the Merger –

7.   This misrepresentation is thus material because it bears directly on the one thing most

important and material to shareholders in voting on a merger – namely, the value that they are

getting in the Merger for their shares. The misrepresentation is all the more egregious in light of

the facts that (a) that members of the GTX Board and management conducted concurrent future

---

[1]     As outlined in Lead Plaintiff Cooper's original complaint, the Proxy also failed to disclose critical material information regarding (a) the financial projections for GTx and Oncternal; (b) the process that resulted in the Merger; and (c) potential conflicts of interest affecting certain members of the Board. Dkt. No. 1 at ¶¶30-38. However, in consultation with undersigned counsel, on or about May 24, 2019, GTx filed a Form 8-K Current Report with the SEC that addressed the material non-disclosures outlined in Plaintiffs' original complaint. Plaintiffs and their counsel specifically reserve their right to seek an appropriate award of attorneys' fees and expenses in connection with those supplemental disclosures.

employment communications **during** the negotiations that resulted in the Merger Agreement and secured employment for themselves in connection therewith, (b) the Board evaluated and ultimately rejected multiple other offers that may have led to no personal benefits for its members, and (c) GTx management and the Board were reportedly concerned that "any merger with a private company presented difficult corporate structuring issues for a public company and the proposals that had been suggested so far would result in significant dilution for GTx's stockholders," but nonetheless entered into exactly such a transaction with Oncternal. Finally, this misrepresentation is particularly egregious in light of the fact that the Board entered into the Merger Agreement when GTx stock was trading at an historical low, such that this misrepresentation locked in an even greater loss for virtually every GTx shareholder.

8.   For these reasons and as set forth in detail herein, Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiffs allege violations of Section 14(a) and 20(a) of the Exchange Act.

10.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp.*

*v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. More specifically, GTx's common stock is listed and traded on the Nasdaq Capital Market, which is headquartered in this District, and the Proxy was mailed into New York, where members of the Class undoubtedly reside. Furthermore, the Proxy informed GTx shareholders that they could read and copy any reports, statements or other information that GTx files with the SEC—including the Proxy—in the SEC's public reference rooms, including the one located in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003).

## PARTIES

12.     Plaintiffs are, and at all relevant times were, GTx shareholders.

13.     Defendant GTx is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 17 W Pontotoc Ave., Suite 100, Memphis, Tennessee 38103.

14.     Defendant Robert J. Wills ("Wills") was, at all relevant times, a director of the Company, and had served as Chairman of the Board since March 2015.

15.     Defendant Marc S. Hanover ("Hanover") was, at all relevant times, a director of the Company, and served as the Company's co-founder and Chief Executive Officer ("CEO").

16.     Defendant J.R. Hyde, III ("Hyde") was, at all relevant times, a director of the Company. In conjunction with Mr. Wills' appointment as Chairman of the Board effective March

2015, Mr. Hyde was appointed as the Board's Lead Director. Previously, Mr. Hyde served as Chairman of the Board from November 2000 through February 2015.

17. Defendant J. Kenneth Glass ("Glass") was, at all relevant times, a director of the Company.

18. Defendant Michael G. Carter ("Carter") was, at all relevant times, a director of the Company.

19. Defendant Kenneth S. Robinson ("Robinson") was, at all relevant times, a director of the Company.

20. Defendant Garry A. Neil ("Neil") was, at all relevant times, a director of the Company.

21. Defendants Wills, Hanover, Hyde, Glass, Carter, Robinson, and Neil form the former Board of Directors of GTx and are collectively referred to herein as the "Board" or the "Individual Defendants." Each of the Individual Defendants at all relevant times had the power to control and direct GTx to engage in the misconduct alleged herein.

## CLASS ACTION ALLEGATIONS

22. Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the other public shareholders of GTx (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

23. This action is properly maintainable as a class action because:

a. The Class is so numerous that joinder of all members is impracticable. As of April 15, 2019 (the record date for the shareholder vote on the Merger), there were approximately 24,051,844 outstanding shares of GTx common stock. And, as of the vote,

there remained 24,051,844 outstanding shares of GTx common stock entitled to vote on the Merger. The actual number of public shareholders of GTx will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

        i)      whether Defendants have misrepresented or omitted material information concerning the Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

        ii)      whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

        iii)      the amount of damages Plaintiffs and other members of the Class have suffered damages as a result of Defendants' material omissions and misstatements.

c.      Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiffs claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.  A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.  FACTUAL BACKGROUND

#### A.  Relevant Corporate Background

24.  Up until the Merger, pre-Merger GTx was a biopharmaceutical company dedicated to the discovery, development, and commercialization of medicines to treat serious and significant unmet medical conditions. According to the Company's website, the following graphic represented the Company's pipeline:



25.  Under an exclusive worldwide license agreement with the University of Tennessee

Research Foundation ("UTRF"), GTx was developing UTRF's proprietary selective androgen receptor degrader ("SARD") technology, which, according to the Company's annual report filed on Form 10-K on March 18, 2019, the Company believes has the potential to provide compounds that can degrade or antagonize multiple forms of androgen receptor, thereby potentially inhibiting tumor growth in patients with progressive castration-resistant prostate cancer, including those patients who do not respond to or are resistant to current androgen targeted therapies.

26.     Up until late 2018, GTx had also been developing selective androgen receptor modulators ("SARMs"). GTx's SARM product candidate, enobosarm (GTx-024), was most recently evaluated in post-menopausal women with stress urinary incontinence ("SUI"). However, as outlined below, during the third quarter of 2018, GTx announced that the ASTRID trial regarding enobosarm had failed to achieve statistical significance on the primary endpoint of the proportion of patients with a greater than 50% reduction in incontinence episodes per day compared to placebo. Thereafter, GTx determined that there was not a sufficient path forward to warrant additional clinical development of enobosarm to treat SUI and has therefore discontinued further development of enobosarm to treat SUI, including discontinuing the related durability and open-label safety extension studies GTx initiated before it received topline data from the ASTRID trial. GTx also discontinued any further development of its SARM program generally.

27.     Up until the Merger, pre-Merger Oncternal was a clinical-stage biopharmaceutical company focused on developing a diverse pipeline of product candidates for cancers with critical unmet medical need. The company's development efforts were focused on promising, yet untreated biological pathways implicated in cancer generation or progression. Oncternal's lead product was designed to inhibit receptor tyrosine kinase-like Orphan Receptor 1, which is a growth factor receptor that is widely expressed on many tumors and whose overexpression has been

correlated with poor prognosis, which activates pathways that lead to increased tumor proliferation, invasiveness, and drug resistance.

      **B.**     **Relevant Events Leading to the Execution of the Merger Agreement**

      28.    As noted above, in September 2017, GTx initiated a randomized, placebo-controlled Phase 2 clinical trial (the "ASTRID Trial") of its lead SARM product candidate enobosarm. However, in September 2018, data from the trial indicated that the ASTRID Trial had failed to achieve statistical significance on the trial's primary endpoint. Thereafter, after completing its review of the full data sets from the clinical trial and discussing the data with clinical experts, GTx determined that there was not a sufficient path forward to warrant additional clinical development of enobosarm to treat SUI. It therefore discontinued further development of enobosarm to treat SUI, including discontinuing the related durability and open-label safety extension studies which were initiated before GTx received topline data from the ASTRID Trial.

      29.    On September 21, 2018, GTx announced that the ASTRID Trial failed to achieve statistical significance on the primary endpoint of the proportion of patients with a greater than 50% reduction in incontinence episodes per day compared to placebo. Importantly, though, despite this news, GTx continued to own viable technology and other candidates for development, and the Proxy specifically noted that "GTx had sufficient cash to undertake SARD development on its own without the need to raise additional funds until sometime in 2020."

      30.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



31.     Nonetheless, following the September announcement, members of GTx management began reaching out to third parties to discuss a potential sale of GTx's technology and/or GTx itself. Throughout the remainder of 2018, GTx communicated with a number of potential acquirers of both its technology and the Company as a whole.

32.     Notably, during these negotiations, members of management conducted discussions regarding potential future employment. For example, as early as October 2018, members of management discussed with one of the bidders (Party D) its "willingness to provide employment to several clinical and financial personnel should a transaction between Company D and GTx come to fruition." Also during these negotiations, GTx management and the Board were reportedly concerned that "any merger with a private company presented difficult corporate structuring issues for a public company and the proposals that had been suggested so far would result in significant dilution for GTx's stockholders" – but nonetheless later entered into exactly

such a transaction with Oncternal.



  e. And, ultimately, Drs. Carter and Wills indeed remained on the post-Merger board as part of the Merger.

34.     Ultimately, despite the Company's stated belief in the potential of SARD and the fact that it had the funds to develop that technology itself, on March 6, 2019, the Board caused the Company to enter into the Merger Agreement.

35.    The following day, on March 7, 2019, GTx and Oncternal issued a joint press release announcing the Merger. Therein, the Board represented to pre-Merger GTx shareholders that they would be receiving 25% of the combined company's stock:

**GTx and Oncternal Therapeutics Enter into Definitive Merger Agreement to Create Nasdaq-Listed Clinical-Stage Company Developing a Diverse Pipeline of Novel Cancer Therapies**

*— Merger will combine Oncternal's clinical stage oncology pipeline and expertise with GTx's preclinical Selective Androgen Receptor Degrader (SARD) program for castration-resistant prostate cancer*

*— Conference call to be held today at 8:30 a.m. Eastern Time/5:30 a.m. Pacific Time —*

**MEMPHIS, Tenn. and SAN DIEGO, Calif. — March 7, 2019** —  GTx, Inc. (Nasdaq: GTXI) and   Oncternal Therapeutics, Inc., a privately held clinical-stage biotechnology company developing potential first-in-class therapeutic candidates for cancers with critical unmet medical need, today jointly announced that they have entered into a definitive merger agreement under which the stockholders of Oncternal would become the majority owners of GTx's outstanding common stock. The proposed merger will create a publicly-traded, clinical-stage oncology company.

The combined company will be named Oncternal Therapeutics, Inc. and plans to change its ticker symbol on the Nasdaq Capital Market to ONCT upon closing of the transaction.

The combined company will have a strong balance sheet and deep pipeline of promising oncology drug programs advancing in development:

- Oncternal's lead program, cirmtuzumab, is an investigational, potential first-in-class anti-ROR1 monoclonal antibody.  Cirmtuzumab is currently in a Phase 1/ 2 clinical trial in combination with ibrutinib for the treatment of chronic lymphocytic leukemia (CLL) and mantle cell lymphoma (MCL).  In addition, an investigator-initiated Phase 1 clinical trial of cirmtuzumab in combination with paclitaxel for women with metastatic breast cancer is being conducted at the University of California San Diego (UC San Diego).

- TK216, an investigational, potential first-in-class small molecule designed to inhibit the biological activity of ETS-family transcription factor oncoproteins, is being evaluated alone and in combination with vincristine in a Phase 1 clinical trial in patients with relapsed or refractory Ewing sarcoma.

- A ROR-1 targeted chimeric antigen receptor T-cell (CAR-T) program is in preclinical development at UC San Diego for hematologic and solid tumors.

- A Selective Androgen Receptor Degrader (SARD) program, an investigational, potential first-in-class preclinical program designed for oral administration to treat castration-resistant prostate cancer in men who are non-responsive to current androgen targeted therapies.

Cash, cash equivalents and short-term investments for the combined company are expected to be approximately $26 million, if the merger closes by the end of the second quarter of 2019. These funds are expected to be sufficient to advance Oncternal's programs into the second quarter of 2020, including the Phase 2 study of cirmtuzumab and ibrutinib, and will fund the planned SARD preclinical studies to support the submission of an investigational new drug application with the U.S. Food and Drug Administration.

James Breitmeyer, MD, PhD, cofounder, president and CEO of Oncternal and a 30-year veteran of the pharmaceutical industry, will continue as president and CEO of the combined company. David Hale, cofounder of Oncternal and a 35-year veteran of numerous successful private and public biotech companies, will continue as Chairman of the Board of the combined company.

"This merger introduces Oncternal and its promising oncology pipeline to the public market and provides additional capital resources to advance our programs to potential value inflection points," said Dr. Breitmeyer. "In addition to clinical data expected from our cirmtuzumab and TK216 programs later this year and during the first half of 2020, we also plan to have preclinical results that get us ready for clinical testing of our ROR1 CAR-T program. The addition of GTx's SARD technology strengthens our pipeline and augments our entire oncology franchise, which includes a range of therapeutic approaches for a variety of difficult to treat cancers."

"This transaction with Oncternal reflects the continued commitment of our management team and Board of Directors to deliver value to stockholders and make a difference in patients' lives," said Robert J. Wills, PhD, Executive Chairman of GTx. "Following a thorough review of strategic alternatives, we have determined that a reverse merger with Oncternal will enable GTx investors to participate in Oncternal's broader pipeline of oncology opportunities, including product candidates designed to address rare disease indications, and enable the continued

development of our first-in-class SARD technology by a company whose leadership has deep experience in developing oncology medicines."

**About the Proposed Merger**

The merger is structured as a stock-for-stock transaction whereby all of Oncternal's outstanding shares of common stock and securities convertible into or exercisable for Oncternal's common stock will be converted into GTx common stock and securities convertible into or exercisable for GTx common stock. <u>Immediately following the closing of the transaction, the former stockholders of Oncternal will hold approximately 75% of the outstanding shares of common stock of the combined company. In addition to retaining an ownership interest representing approximately 25% of the outstanding shares of common stock of the combined company,</u> the GTx stockholders of record as of immediately prior to the effective time of the merger will receive non-transferable contingent value rights ("CVR") entitling the holders to receive in the aggregate 50% of any net proceeds derived from the grant, sale or transfer of rights to SARD or selective androgen receptor modulator (SARM) technology during the term of the CVR and, if applicable, to receive royalties on the sale of any SARD products by the combined company during the term of the CVR. Under certain circumstances further described in the merger agreement, the exchange ratio of the outstanding shares of common stock of the combined company may be adjusted upward or downward based on cash levels of each of the companies at closing.

Upon closing of the transaction, GTx will be renamed Oncternal Therapeutics, Inc. and will be headquartered in San Diego, California under the leadership of Oncternal's current management team. Although no GTx employee is expected to remain an employee of the combined company, the merger agreement provides that the Board of Directors of the combined company will be comprised of nine members, including seven designated Oncternal directors as well as Robert J. Wills, PhD and Michael G. Carter, MD, from GTx's current Board. The combined company is expected to trade on The Nasdaq Capital Market under a new ticker symbol, ONCT. The merger agreement has been unanimously approved by the Board of Directors of each company. The transaction is expected to close in the second quarter of 2019, subject to approvals by stockholders of each company and other customary closing conditions.

Aquilo Partners, L.P. is acting as exclusive financial advisor to GTx on the proposed transaction and Cooley LLP serves as legal counsel to GTx. Piper Jaffray is acting as exclusive financial advisor to Oncternal on the proposed transaction and Latham & Watkins, LLP serves as legal counsel to Oncternal.

(Bold in original; underlining added.)

**C.    Events Following the Execution of the Merger Agreement**

36.     On or about April 8, 2019, Defendants caused to be filed with the SEC a form S-4 Registration Statement, which also acted as a preliminary proxy statement, prospectus, and/or information statement for pre-Merger GTx shareholders. Therein, Defendants repeatedly represented to pre-Merger GTx shareholders that they would be receiving 25% of the combined company's stock.

37.     Thereafter, in light of academic research received by GTx and shared with Oncternal, on April 30, 2019, the parties amended the original merger agreement (resulting in the Merger Agreement defined above), pursuant to which the original exchange ratio of 0.4474 was increased to the current exchange ratio of 0.5137, the amount of the post close company that current GTX shareholders would hold was reduced from 25% to 22.5%, and the CVR was devalued.

38.



39.     On or about May 7, 2019, Defendants caused to be filed with the SEC a proxy statement/prospectus/information statement (previously defined as the "Proxy"), which served as the definitive proxy, prospectus, and information statement for pre-Merger GTx shareholders and which was mailed to pre-Merger GTx shareholders on or about May 10, 2019. The Proxy solicited pre-Merger GTx's shareholders to vote in favor of the Merger and disclosed the bases on which the Board relied to recommend and solicit votes in favor of the Merger.  As outlined in greater

depth below, the Proxy repeatedly represented to pre-Merger GTx shareholders that they would be receiving 22.5% of the combined company's stock, ███████████████

40.     On June 5, 2019, the GTx shareholders voted in connection with the Merger. Notably, as noted above, despite the fact that (a) there were 24,051,844 outstanding shares of GTx common stock entitled to vote on the Merger and (b) stockholders of GTx who signed voting agreements with Oncternal to vote in favor of the Merger owned an aggregate of 10,938,824 of those shares (representing approximately 45% of the outstanding shares of GTx's common stock), only 13,482,573 votes were cast in favor of the Merger.   That means that, excluding the stockholders that signed voting agreements with Oncternal (many of whom were or were affiliated with Company insiders), only 2,543,749 of the Company's remaining 13,113,020 public shares – *i.e.*, less than 20% – were voted in favor of the Merger.

41.     As again noted above, the Merger closed on June 7, 2019. The combined company now operates under the name "Oncternal Therapeutics, Inc." and its shares trade on the Nasdaq stock exchange under the ticker symbol "ONCT."

42.     Finally, on June 10, 2019, when Defendants announced the closing of the Merger through a press release that was also filed in a form 8-K Current Report with the SEC, they again stated:

> Pursuant to the merger, all of Oncternal's outstanding shares of common stock and securities convertible into or exercisable for Oncternal's common stock were converted into GTx common stock and securities convertible into or exercisable for GTx common stock. Immediately following the completion of the merger, the former stockholders of Oncternal held approximately 77.5% of the outstanding shares of common stock of the combined company. In addition to retaining an ownership interest representing approximately 22.5% of the outstanding shares of common stock of the combined company, the GTx stockholders of record as of immediately prior to the effective time of the merger received contingent value rights (CVR) entitling the holders to receive, in the aggregate, 75% of any net proceeds derived from the grant, sale or transfer of rights to GTx's selective androgen receptor degrader

(SARD) and selective androgen receptor modulator (SARM) technology during the term of the CVR and, if applicable, to receive royalties on the sale of any SARD products by the combined company during the term of the CVR.

## II.  THE MATERIALLY INCOMPLETE AND MISLEADING PROXY

43.     As noted above, on May 7, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Merger.  The Proxy was mailed to pre-Merger GTx shareholders on or about May 10, 2019, and solicited the Company's shareholders to vote in favor of the Merger and disclosed the bases on which the Board relied to recommend and solicit votes in favor of the Merger.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresented and/or omitted material information that was necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

44.     Specifically, the Proxy repeatedly represented to pre-Merger GTx shareholders that they would be receiving 22.5% of the combined company's stock, █████████████████████

45.     For example, in the introductory letter from Defendant Marc S. Hanover, pre-Merger GTx's CEO, the Proxy stated:

> Immediately after the merger, assuming an exchange ratio of 0.5137, Oncternal's stockholders as of immediately prior to the Effective Time will own approximately 77.5% of the outstanding capital stock of GTx, with GTx's stockholders as of immediately prior to the Effective Time owning approximately 22.5% of the outstanding capital stock of GTx. The exchange ratio formula excludes Oncternal's outstanding stock options and warrants and GTx's outstanding stock options and warrants. These estimates are subject to adjustment prior to closing of the merger.

46.     On page 1 of the Proxy, in the "Questions and Answers" Section of the Proxy, under the question "What is the Merger?," the Proxy stated:

As a result of the merger, based on the estimated exchange ratio of 0.5137, current holders of Oncternal's capital stock are expected to own in the aggregate approximately 77.5% of the outstanding capital stock of GTx, with GTx's current stockholders owning approximately 22.5% of the outstanding capital stock of GTx. The ownership percentage to be held by GTx's stockholders is subject to adjustment prior to closing of the merger, including a downward adjustment to the extent that GTx's "Parent Cash Amount" (as defined in the Merger Agreement) at the Effective Time is less than the threshold provided in the Merger Agreement, which adjusts based on the date of closing (and as a result, GTx stockholders could own less, and Oncternal stockholders could own more, of the combined company), or an upward adjustment to the extent that Oncternal's "Company Cash Amount" (as defined in the Merger Agreement) at the Effective Time is less than the threshold provided in the Merger Agreement (and as a result, GTx stockholders could own more, and Oncternal stockholders could own less, of the combined company). The exchange ratio formula excludes Oncternal's outstanding stock options and warrants and GTx's outstanding stock options and warrants. GTx will assume outstanding and unexercised warrants and options to purchase shares of Oncternal capital stock, and such securities will be converted into warrants and options, as applicable, to purchase shares of GTx's common stock.

47.    On page 11-12 of the Proxy, in the Prospectus section of the Proxy, under a heading

entitled, "The Merger," the Proxy stated:

Immediately after the merger, assuming an exchange ratio of 0.5137, Oncternal's stockholders as of immediately prior to the Effective Time will own approximately 77.5% of the outstanding capital stock of GTx, and GTx's stockholders as of immediately prior to the Effective Time will own approximately 22.5% of the outstanding capital stock of GTx. The ownership percentage to be held by GTx's stockholders is subject to adjustment prior to closing of the merger, including a downward adjustment to the extent that GTx's "Parent Cash Amount" (as defined in the Merger Agreement) at the Effective Time is less than the threshold provided in the Merger Agreement, which adjusts based on the date of closing (and as a result, GTx stockholders could own less, and Oncternal stockholders could own more, of the combined company), or an upward adjustment to the extent that Oncternal's "Company Cash Amount" (as defined in the Merger Agreement) at the Effective Time is less than the threshold provided in the Merger Agreement (and as a result, GTx stockholders could own more, and Oncternal stockholders could own less, of the combined company). The exchange ratio formula excludes Oncternal's outstanding stock options and warrants and GTx's outstanding stock options and warrants. GTx will assume outstanding and unexercised options and warrants to purchase Oncternal capital stock, and each such option or warrant will be converted into options or warrants, as applicable, to

purchase GTx's common stock.

48.     On page 15 of the Proxy, in the same section, under a heading entitled "Merger Consideration," the Proxy stated:

> Immediately after the merger, assuming an exchange ratio of 0.5137, Oncternal's stockholders as of immediately prior to the Effective Time will own approximately 77.5% of the outstanding capital stock of GTx and GTx stockholders as of immediately prior to the Effective Time will own approximately 22.5% of the outstanding capital stock of GTx. The ownership percentage to be held by GTx's stockholders is subject to adjustment prior to closing of the merger, including a downward adjustment to the extent that GTx's "Parent Cash Amount" (as defined in the Merger Agreement) at the Effective Time is less than the threshold provided in the Merger Agreement, which adjusts based on the date of closing (and as a result, GTx stockholders could own less, and Oncternal stockholders could own more, of the combined organization), or an upward adjustment to the extent that Oncternal's "Company Cash Amount" (as defined in the Merger Agreement) at the Effective Time is less than the threshold provided in the Merger Agreement (and as a result, GTx stockholders could own more, and Oncternal stockholders could own less, of the combined organization). The exchange ratio formula excludes Oncternal's outstanding stock options and warrants and GTx's outstanding stock options and warrants.

49.     On page 26 of the Proxy, in the "Selected Unaudited Pro Forma Condensed Combined Financial Data of GTx and Oncternal" Section of the Proxy, the Proxy stated:

> The unaudited pro forma condensed combined financial information assumes that, at the Effective Time, each share of Oncternal common stock will be converted into the right to receive shares of GTx common stock such that, immediately following the Effective Time, GTx's stockholders as of immediately prior to the Effective Time are expected to own approximately 22.5% of the outstanding common stock of GTx, and Oncternal's stockholders as of immediately prior to the Effective Time are expected to own approximately 77.5% of the outstanding common stock of GTx, and is subject to adjustment to account for the occurrence of certain events discussed elsewhere in this proxy statement/prospectus/information statement. The ownership percentage to be held by GTx's stockholders is subject to adjustment prior to closing of the merger, including a downward adjustment to the extent that GTx's "Parent Cash Amount" (as defined in the Merger Agreement) at the Effective Time is less than the threshold provided in the Merger Agreement, which adjusts based on the date of closing (and as a result, GTx stockholders could own less, and Oncternal stockholders could own more, of the combined organization), or an upward adjustment to the

extent that Oncternal's "Company Cash Amount" (as defined in the Merger Agreement) at the Effective Time is less than the threshold provided in the Merger Agreement (and as a result, GTx stockholders could own more, and Oncternal stockholders could own less, of the combined organization). The exchange ratio formula excludes Oncternal's outstanding stock options and warrants and GTx's outstanding stock options and warrants.

50.     On page 28 of the Proxy, in the "Risks Related to the Merger" Section of the Proxy, under the heading entitled "The exchange ratio set forth in the Merger Agreement is not adjustable based on the market price of GTx common stock, so the merger consideration at the closing of the merger may have a greater or lesser value than at the time the Merger Agreement was signed," the Proxy stated:

> The Merger Agreement has set the exchange ratio for the Oncternal capital stock, and the exchange ratio is based on the outstanding capital stock of Oncternal and the outstanding common stock of GTx, in each case immediately prior to the closing of the merger as described under the heading "The Merger—Merger Consideration." Applying the exchange ratio formula in the Merger Agreement, the former Oncternal stockholders immediately before the merger are expected to own approximately 77.5% of the outstanding capital stock of GTx immediately following the merger, and the stockholders of GTx immediately before the merger are expected to own approximately 22.5% of the outstanding capital stock of GTx immediately following the merger, subject to certain assumptions. Under certain circumstances further described in the Merger Agreement, however, **these ownership percentages may be adjusted upward or downward <u>based on cash levels of the respective companies at the closing of the merger, and as a result, either GTx's stockholders or the Oncternal stockholders could own less of the combined company than expected.</u>**

(Emphasis added.)

51.     On page 30-31 of the Proxy, in the same section, under the heading entitled "GTx and Oncternal securityholders will have a reduced ownership and voting interest in, and will exercise less influence over the management of, the combined organization following the closing of the merger as compared to their current ownership and voting interest in the respective companies," the Proxy stated:

After the completion of the merger, the current securityholders of GTx and Oncternal will own a smaller percentage of the combined organization than their ownership in their respective companies prior to the merger. Immediately after the merger, it is currently estimated that Oncternal securityholders will own approximately 77.5% of the common stock of the combined organization, and GTx securityholders, whose shares of GTx common stock will remain outstanding after the merger, will own approximately 22.5% of the common stock of the combined organization. These estimates are based on the anticipated exchange ratio and are subject to adjustment as provided in the Merger Agreement. See also the risk factor above titled, "*The exchange ratio set forth in the Merger Agreement is not adjustable based on the market price of GTx common stock, so the merger consideration at the closing of the merger may have a greater or lesser value than at the time the Merger Agreement was signed.*"

52.    On page 34 of the Proxy, in the same section, under the heading entitled "The issuance of shares of GTx's common stock to Oncternal stockholders in the merger will substantially dilute the voting power of GTx's current stockholders," the Proxy stated:

If the merger is completed, each outstanding share of Oncternal common stock will be converted into the right to receive a number of shares of GTx's common stock equal to the exchange ratio determined pursuant to the Merger Agreement. Immediately following the merger, the former Oncternal stockholders immediately before the merger are expected to own approximately 77.5% of GTx's outstanding capital stock, and GTx's stockholders immediately before the merger are expected to own approximately 22.5% of GTx's outstanding capital stock, subject to certain assumptions. Accordingly, the issuance of shares of GTx's common stock to Oncternal stockholders in the merger will reduce significantly the relative voting power of each share of GTx common stock held by GTx's current stockholders. Consequently, GTx's stockholders as a group will have significantly less influence over the management and policies of the combined company after the merger than prior to the merger. These estimates are based on the anticipated exchange ratio and are subject to adjustment as provided in the Merger Agreement. See also the risk factor above titled, "*The exchange ratio set forth in the Merger Agreement is not adjustable based on the market price of GTx common stock, so the merger consideration at the closing of the merger may have a greater or lesser value than at the time the Merger Agreement was signed.*"

53.    On page 144 of the Proxy, in the "GTx Reasons for the Merger" Section of the Proxy, the Proxy stated:

The GTx Board also reviewed the amended terms of the Merger Agreement, the CVR Agreement and associated transactions, including:

> the fact that the exchange ratio, which is expected to give GTx stockholders approximately 22.5% of the combined company's outstanding stock, immediately following the merger, remained financially attractive in light of GTx's standalone value, GTx's recent stock price, GTx's strategic alternatives, and the potential value of Oncternal following the merger;

54.     On page 156 of the Proxy, in the "Opinion of GTx Financial Advisor Section as of April 29, 2019" Section of the Proxy, under the heading entitled "Exchange Ratio and Pro Forma Ownership as of the Date of the April Opinion," the Proxy stated:

> Based on the estimated exchange ratio, GTx's stockholders as of immediately prior to the Effective Time are expected to own approximately 22.5% of the outstanding common stock of GTx, and Oncternal's stockholders as of immediately prior to the Effective Time are expected to own approximately 77.5% of the outstanding common stock of GTx, which is subject to adjustment for each company's cash balance at closing in accordance with the Merger Agreement. The exchange ratio formula excludes Oncternal's outstanding stock options and warrants and GTx's outstanding stock options and warrants. Based on each of GTx's and Oncternal's outstanding capital stock as of April 29, 2019 and assuming no adjustment for cash levels and excluding the issuance of shares related to the exercise of any options, restricted stock awards, warrants or rights to receive such shares, and any shares of stock reserved for issuance, other than shares of GTx common stock reserved for issuance pursuant to the GTx Deferred Stock Rights, Aquilo determined that the exchange ratio would be 0.5137.

55.     On page 161-62 of the Proxy, in the "Opinion of GTx Financial Advisor Section as of April 29, 2019" Section of the Proxy, under the discussion of Aquilo's "Implied Value of Outstanding GTx's Common Stock Based on Implied Value of the Combined Company as of the Date of the April Opinion" analysis, the Proxy stated:

> Aquilo calculated the implied value of the combined company by grossing up the Oncternal equity valuation range to 100% when assuming Oncternal contributed 77.5% of the value to the combined company as of the closing. Aquilo also looked separately at the implied value of the combined company based solely on Oncternal's post-money valuation following the issuance of Oncternal's Series C preferred stock.

Aquilo then calculated the implied equity valuation attributable to the holders of GTx's common stock, assuming 22.5% ownership in the combined company by the holders of GTx common stock as of the closing.

| ($ millions) | Low | High | Series C Private Financing Valuation |
|---|---|---|---|
| Oncternal equity valuation range | $162.8 | $199.6 | $ 87.7 |
| Implied valuation of the combined company | $210.1 | $257.5 | $ 113.2 |
| Value attributable to holders of GTx common stock based on 22.5% ownership: | $ 47.3 | $ 57.9 | $ 25.5 |

Aquilo then reviewed the premium of the value attributable to holders of GTx common stock in this analysis as compared to GTx's most recent equity market capitalization prior to the delivery of its April Opinion and the value of GTx as determined by the GTx comparable public company analysis.

| ($ millions) | Low | High | Series C Private Financing Valuation |
|---|---|---|---|
| Value attributable to holders of GTx common stock based on 22.5% ownership: | $47.3 | $57.9 | $ 25.5 |
| Premium to: | | | |
| GTx market capitalization as of March 6, 2019 | 113% | 161% | 15% |
| GTx comparable public company analysis | 125% | 176% | 21% |

56.    On page 175 of the Proxy, in the "Merger Consideration" Section of the Proxy, the Proxy stated:

Immediately after the merger, based on the estimated exchange ratio, it is expected that Oncternal's existing stockholders will own approximately 77.5% of the outstanding capital stock of GTx with GTx's existing stockholders owning approximately 22.5% of the outstanding capital stock of GTx. The ownership percentage to be held by GTx's stockholders is subject to adjustment prior to closing of the merger, including a downward adjustment to the extent that GTx's "Parent Cash Amount" (as defined in the Merger Agreement) at the Effective Time is less than the threshold provided in the Merger Agreement, which adjusts based on the date of closing (and as a result, GTx stockholders could own less, and Oncternal stockholders could own more, of the combined organization), or an upward adjustment to the extent that Oncternal's "Company Cash Amount" (as defined in the Merger Agreement) at the Effective Time is less than $12,500,000 (and as a result, GTx stockholders could own more, and Oncternal stockholders could own less, of the combined organization). The exchange ratio formula excludes Oncternal's outstanding stock options and warrants and GTx's outstanding stock options and warrants.

57.    On page 206 of the Proxy, in the "Matters Being Submitted to a Vote of GTx's Stockholders" Section of the Proxy, under "Proposal No. 1: Approval of the Merger Agreement,

the Merger, the Issuance of Common Stock in the Merger and the Change of Control Resulting

from the Merger," the Proxy stated:

> At the GTx special meeting, GTx's stockholders will be asked to approve the Merger Agreement and the transactions contemplated thereby, including the merger, the issuance of GTx's common stock to Oncternal's stockholders pursuant to the Merger Agreement and the change of control resulting from the merger. Immediately following the merger, it is expected that Oncternal's current stockholders will own approximately 77.5% of the outstanding common stock of GTx and current GTx stockholders with GTx's current stockholders will own approximately 22.5% of the outstanding common stock of GTx. The ownership percentage to be held by GTx's stockholders is subject to adjustment prior to closing of the merger, including a downward adjustment to the extent that GTx's "Parent Cash Amount" (as defined in the Merger Agreement) at the Effective Time is less than the threshold provided in the Merger Agreement, which adjusts based on the date of closing (and as a result, GTx stockholders could own less, and Oncternal stockholders could own more, of the combined organization), or an upward adjustment to the extent that Oncternal's "Company Cash Amount" (as defined in the Merger Agreement) at the Effective Time is less than $12,500,000 (and as a result, GTx stockholders could own more, and Oncternal stockholders could own less, of the combined organization).

58.     On page 290 of the Proxy, in the "Oncternal Management's Discussion and

Analysis of Financial Condition and Results of Operations" Section of the Proxy, under the

heading entitled "Proposed Merger with GTx," the Proxy stated:

> Under the exchange ratio formula in the Merger Agreement, the former Oncternal stockholders immediately before the merger are expected to own approximately 77.5% of the outstanding capital stock of GTx, and the stockholders of GTx immediately before the merger are expected to own approximately 22.5% of the outstanding capital stock of GTx, subject to certain assumptions and adjustments.

59.     On page 351 of the Proxy, in the "Notes to the Unaudited Pro Forma Condensed

Combined Financial Information" Section of the Proxy, under the heading entitled "Description

of Transaction," the Proxy stated:

> Under the exchange ratio formula in the merger agreement, the former Oncternal stockholders immediately before the merger are expected to own approximately 77.5% of the outstanding capital stock of GTx, and the

stockholders of GTx immediately before the merger are expected to own approximately 22.5% of the outstanding capital stock of GTx, subject to certain assumptions. The exchange ratio formula excludes Oncternal's outstanding stock options and warrants and GTx's outstanding stock options and warrants. To the extent Oncternal's outstanding stock options or warrants are exercised in the future, it will result in further dilution to GTx's stockholders. Under certain circumstances, the ownership percentages may be adjusted upward or downward based on cash levels of the respective companies at the closing of the merger.

60.    The statements made by Defendants and contained in the Proxy outlined above in Paragraphs 45-59 regarding



61.

62.    Indeed, as outlined above in Paragraph 50, the Proxy specifically contained a "Risks Related to the Merger" Section, and even further specifically disclosed certain risks related

to the fact that "the merger consideration at the closing of the merger may have a greater or lesser

value than at the time the Merger Agreement was signed." However, that Section of the Proxy

only disclosed the following such risks:

> The Merger Agreement has set the exchange ratio for the Oncternal capital
> stock, and the exchange ratio is based on the outstanding capital stock of
> Oncternal and the outstanding common stock of GTx, in each case
> immediately prior to the closing of the merger as described under the heading
> "The Merger—Merger Consideration." Applying the exchange ratio formula
> in the Merger Agreement, the former Oncternal stockholders immediately
> before the merger are expected to own approximately 77.5% of the
> outstanding capital stock of GTx immediately following the merger, and the
> stockholders of GTx immediately before the merger are expected to own
> approximately 22.5% of the outstanding capital stock of GTx immediately
> following the merger, subject to certain assumptions. Under certain
> circumstances further described in the Merger Agreement, however, **these
> ownership percentages may be adjusted upward or downward <u>based on
> cash levels of the respective companies at the closing of the merger, and
> as a result, either GTx's stockholders or the Oncternal stockholders
> could own less of the combined company than expected</u>**.

(Emphasis added.)



███████████████████████████████████████████

**III.   PLAINTIFFS AND THE CLASS SUFFERED FINANCIAL LOSS AS A RESULT OF THE FALSE AND MISLEADING PROXY, WHICH WAS AN ESSENTIAL LINK NECESSARY TO EFFECTUATE THE UNFAIR MERGER**

65. ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

69.     This misrepresentation is thus material because it bears directly on the one thing most important and material to shareholders in voting on a merger – namely, the value that they are getting in the Merger for their shares. The misrepresentation is all the more egregious in light

of the facts that (a) that members of the GTX Board and management conducted concurrent future employment communications **during** the negotiations that resulted in the Merger Agreement and secured employment for themselves in connection therewith, (b) the Board evaluated and ultimately rejected multiple other offers that may have led to no personal benefits for its members, and (c) GTx management and the Board were reportedly concerned that "any merger with a private company presented difficult corporate structuring issues for a public company and the proposals that had been suggested so far would result in significant dilution for GTx's stockholders," but nonetheless entered into exactly such a transaction with Oncternal. Finally, this misrepresentation is particularly egregious in light of the fact that the Board entered into the Merger Agreement when GTx stock was trading at an historical low, such that this misrepresentation locked in an even greater loss for virtually every GTx shareholder.

70.     In other words, the consummation of the Merger not only locked the Company's shareholders in at a stock price that was at its lowest trading range in GTx history ██████████ ████████████████████████████████████████████████████████████████████ ███████████████████████ As a result, the Merger – and the material misrepresentations that led to it – seriously limited their opportunity to reap the rewards of GTx's growth potential.[2]

71.     The Merger also undervalued GTx in light of the Company's independent growth prospects and significant strategic initiatives the Company accomplished prior to the consummation of the Merger. As outlined above in Paragraph 30, the Board ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[2]     And, while the Merger Agreement does provide for a limited Contingent Value Right ("CVR") that may allow GTx stockholders to receive payments based on the grant, sale, or transfer of GTx's SARD or SARM technology, those payments are both limited in amount and duration.

72.     Unsurprisingly, since the June 7, 2019 consummation of the Merger, the combined company's stock price has plummeted, dropping from a high of 8.40 on June 7, 2019 to a current price (as of September 11, 2019) of just $5.70, **losing nearly 1/3 of its value** in that time, as reflected by the chart below:



This evaporation of value is another clear indication that pre-Merger GTx shareholders suffered damages as a result of the Merger, and that the market agrees that the Merger Consideration inadequately valued GTx.

73.     The Board required pre-Merger GTx shareholder approval to consummate the Merger. To achieve this, they submitted the materially incomplete and misleading Proxy to shareholders. Accordingly, the false and misleading Proxy was an essential link in accomplishing the Merger, which undervalued GTx and caused Plaintiff and the Class to suffer financial loss in

that they did not retain a fair equity stake – ████████████████████████ – in

the post-Merger combined company.

## COUNT I

**On Behalf of Plaintiff and the Class Against
GTX and the Individual Defendants for Violations of Section 14(a)
of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder**

74.    Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

75.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use

of the mails or by any means or instrumentality of interstate commerce or of any facility of a

national securities exchange or otherwise, in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

authorization in respect of any security (other than an exempted security) registered pursuant to

section 78l of this title." 15 U.S.C. § 78n(a)(1).

76.    SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of

the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any 14D9
> statement, form of 14D9, notice of meeting or other communication, written
> or oral, containing any statement which, at the time and in light of the
> circumstances under which it is made, is false or misleading with respect to
> any material fact, or which omits to state any material fact necessary in order
> to make the statements therein not false or misleading or necessary to correct
> any statement in any earlier communication with respect to the solicitation of
> a 14D9 for the same meeting or subject matter which has become false or
> misleading.

77.    Defendants issued the Proxy with the intention of soliciting stockholder support for

the Merger. Each of the Defendants reviewed and/or authorized the dissemination of the Proxy

and the use of their name in the Proxy, which fails to provide material information regarding █

██████████████████████████████████████████████████████████

78.     In so doing, Defendants made untrue statements of fact and/or omitted to state material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

79.     Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger. ███████████████

███████████████████████████████████████████████████████

and the Proxy states that the Board considered the fairness opinion provided by Aquilo and the assumptions made and matters considered in connection therewith. The Individual Defendants were further required to review Aquilo's analyses in connection with their receipt of the fairness opinions, question Aquilo as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions. Defendants knew or were negligent in not knowing that the material information identified above was omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and

misleading.

80.     The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully. Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement, the preparation and review of strategic alternatives, the review of both companies' financial projections, and the preparation of the Proxy.

81.     The misrepresentations, falsehoods, and omissions in the Proxy were material to Plaintiff and the Class. The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information available to stockholders.

82.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to obtain stockholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses ██████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

**On Behalf of Plaintiff and the Class Against the Individual Defendants
for Violations of Section 20(a) of the Securities Exchange Act of 1934**

83.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

84.     The Individual Defendants acted as controlling persons of GTx within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of GTx, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

85.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. ████████████████████ ████████████████████████████████████████████ ████████████████ The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  They were, thus, directly involved in the making of this document.

87.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants

reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

88.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

89.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses ████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████ in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the Class representatives and Plaintiffs' counsel as Class counsel;

B.     Awarding Plaintiffs and the Class compensatory and/or recissory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

C.     Awarding Plaintiffs and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


Dated: September 16, 2019                     **MONTEVERDE & ASSOCIATES PC**

                                              By: _/s/ Juan E. Monteverde_
                                                  Juan E. Monteverde (JM-8169)
                                                  The Empire State Building
                                                  350 Fifth Avenue, Suite 4405
                                                  New York, NY 10118
                                                  Tel:(212) 971-1341
                                                  Fax:(212) 202-7880
                                                  Email: jmonteverde@monteverdelaw.com

                                              *Attorneys for Lead Plaintiffs*


**OF COUNSEL:**

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina, Esq.
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Tel.: (504) 455-1400
Fax: (504) 455-1498
E-mail: Michael.Palestina@ksfcounsel.com


*Attorneys for Lead Plaintiffs*