UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE GTX, INC. SHAREHOLDERS
LITIGATION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _6/23/2020_

19 Civ. 3239 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Lead Plaintiffs, Nabil Barakat and Michael Cooper, on behalf of themselves and the pre-merger holders of the common stock of GTx, Inc. ("GTx"), bring this action against Defendants, GTx and its pre-merger Board of Directors, for their alleged violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 in connection with GTx's merger with Oncternal Therapeutics, Inc. ("Oncternal"). Compl. ¶ 1, ECF No. 26. Now before the Court is Defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 52. For the reasons stated below, the motion is GRANTED.

**BACKGROUND**

The following facts are taken from the complaint and "are presumed to be true for purposes of considering a motion to dismiss for failure to state a claim." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 398 (2d Cir. 2015). Before its merger with Oncternal, GTx was a publicly-traded biopharmaceutical company dedicated to the development and commercialization of medicines to treat unmet medical conditions, including cancers. Compl. ¶¶ 24–25. Before the merger, Oncternal was a clinical-stage biopharmaceutical company, also focused on developing product candidates for treating cancers. *Id.* ¶ 27.

Until late 2018, GTx had been developing selective androgen receptor modulators ("SARM") for cancer treatment. *Id.* ¶¶ 24–26. In September 2018, however, GTx announced that a clinical trial (the "ASTRID Trial") of its lead SARM product candidate, enobosarm, had

failed to achieve statistical significance and that its development would be discontinued. *Id.*
¶¶ 28–29. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████ *Id.* ¶ 30.  Nevertheless, following the failure of the ASTRID Trial,

GTx management began negotiating a possible sale of GTx's technology or the company itself.

*Id.* ¶¶ 31, 32.

On March 6, 2019, GTx entered into a merger agreement with Oncternal. *Id.* ¶¶ 2, 34.

That same day, GTx's ███████████████████████████

███████████████████████████████████ *Id.* ¶ 34. ███████

███████████████████████████████████

███████████████████████████████████

███████████ *Id.*

On March 7, 2019, GTx and Oncternal issued a joint press release announcing the merger

and stating that GTx shareholders would retain "an ownership interest representing

approximately 25% of the outstanding shares of common stock of the combined company."

*Id.* ¶ 35.  On April 8, 2019, Defendants filed a Form S-4 with the Securities and Exchange

Commission (the "SEC"); the Form S-4 also served as a preliminary proxy statement for GTx

shareholders, stating that GTx shareholders would receive approximately 25% of the combined

company's stock. *Id.* ¶ 36.

On April 30, 2019, the merger agreement was amended such that Grizzly Merger Sub,

Inc., a wholly-owned subsidiary of GTx, would merge with and into Oncternal, with Oncternal

surviving as a wholly-owned subsidiary of GTx (the "Merger").  Compl. ¶¶ 2, 34.  Compared to

the originally proposed merger, the final Merger increased the exchange ratio[1] from 0.4474 to 0.5137, reduced the portion of the combined company that GTx shareholders would purportedly retain from 25% to 22.5%, and devalued the non-transferable contingent value rights.  *Id.* ¶ 37.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████ *Id.* ¶ 38.

On May 7, 2019, Defendants filed their proxy statement (the "Proxy"[2]) with the SEC, pursuant to SEC Rule 424(b)(3), and on May 10, 2019, Defendants mailed the Proxy to GTx shareholders.  *Id.* ¶ 39.  The Proxy solicited GTx shareholders' vote in favor of the Merger.  *Id.* An introductory letter on the first page of the Proxy stated that GTx stockholders will "own[] approximately 22.5% of the outstanding capital stock of GTx" "as of immediately prior to the [e]ffective [t]ime" of the Merger, that this "exchange ratio formula excludes Oncternal's outstanding stock options and warrants and GTx's outstanding stock options and warrants," and that "[t]hese estimates are subject to adjustment prior to closing of the merger."  *Id.* ¶ 45. Similar language is repeated throughout the Proxy.  *See id.* ¶¶ 46–49; *see also id.* ¶ 56 ("Immediately after the merger, . . . it is expected that . . . GTx's existing stockholders [will] own[] approximately 22.5% of the outstanding capital stock of GTx.").  In the section titled "Risk Related to the Merger," the Proxy stated that the approximate 22.5% / 77.5% "ownership percentages may be adjusted upward or downward based on cash levels of the respective

---

[1] The "exchange ratio" is the relative number of new shares that will be given to existing shareholders of a company that has merged with another.  *See* James Chen, *Exchange Ratio Definition*, Investopedia (Apr. 24, 2019), https://www.investopedia.com/terms/e/exchangeratio.asp.
[2] The Proxy can be found on the SEC's website.  *See* https://www.sec.gov/Archives/edgar/data/1260990/000119312519139911/d722331d424b3.htm; *see also* ECF No. 55-1.

companies at the closing of the [M]erger, and as a result, either GTx's stockholders or the Oncternal stockholders could own less of the combined company than expected." *Id.* ¶ 50. Similar language is repeated throughout the Proxy. *See id.* ¶¶ 51, 52, 58, 59.

The Merger closed on June 7, 2019. *Id.* ¶ 41. Defendants announced the closing of the Merger in a press release filed with the SEC in a Form 8-K, stating that pre-Merger GTx shareholders were "retaining an ownership interest representing approximately 22.5% of the outstanding shares of common stock of the combined company." *Id.* ¶ 42.

Plaintiffs, however, allege ▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 60. ▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 63. ▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 64. ▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 66; *see also id.* ¶ 67 ▮▮▮▮▮▮▮▮▮▮



## DISCUSSION

I. <u>Legal Standard</u>

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007) (internal quotation marks omitted)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Ultimately, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id*. A court must "accept[] the factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

In evaluating the motion to dismiss, "the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) (citing *Chambers*, 282 F.3d at 153). Accordingly, the Court will consider "public disclosure documents that must be filed with the . . . SEC," *id.*, including the Proxy.

II. <u>Analysis</u>

A. Section 14(a) Claim

To state a Section 14(a) claim, a plaintiff must show that "(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link' in the accomplishment of the transaction." *Bond Opportunity Fund v.*

*Unilab Corp.*, No. 99 Civ. 11074, 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003) (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384-85 (1970)), *aff'd*, 87 F. App'x 772 (2d Cir. 2004). Defendants argue that Plaintiffs fail to satisfy the first and second elements. The Court agrees.

1. Material Misrepresentation or Omission

Plaintiffs allege that the Proxy misled shareholders by representing that the only reason that ownership percentage could be "adjusted downward" would be because of the cash levels of the respective companies. Compl. ¶ 64; Pl. Opp. at 23, ECF No. 63 (alleging that the Proxy stated "any potential downward adjustment to their ownership percentage was tied *solely* to GTx's cash at closing"). In other words, Plaintiffs claim that the Proxy omitted ▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬ Compl. ¶ 63, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Pl. Opp. at 13.

"The point of a proxy statement . . . should be to inform, not to challenge the reader's critical wits," *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991), but "nit-picking should not become the name of the game," and "[f]air accuracy, not perfection, is the appropriate standard," *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir. 1978). Whether a misrepresentation is material is determined by the "total mix" of information, not the alleged misstatement in isolation. *Koppel v. 4987 Corp.*, 167 F.3d 125, 131 (2d Cir. 1999) (internal quotation marks and citation omitted); *id.* at 132 (holding that materiality is to be determined by the information "reasonably available to the shareholders" (internal quotation marks and citation omitted)); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 321–24 (4th Cir. 2019) (holding that omitted financial information

did not render disclosed financial information materially misleading because of proxy's clear warnings about the omissions).

Plaintiffs have not adequately alleged a material misrepresentation or omission. First, the Proxy did not suggest that any downward adjustment to ownership percentage was tied solely to cash levels; to the contrary, the Proxy repeatedly warned about the exclusion of options and warrants in the exchange ratio formula. Compl. ¶¶ 45–49, 56. The only possible effect of exercising these options and warrants is a downward adjustment of GTx shareholders' ownership percentage, a basic conclusion that reasonable investors should have reached. *See* Def. Mem. at 15, ECF No. 57.

Second, the Proxy explicitly warned that, "[t]o the extent Oncternal's outstanding stock options or warrants are exercised in the future, it will result in further dilution to GTx's stockholders." Proxy at 351, ECF No. 55-1. The Court, therefore, rejects Plaintiffs' claim that the Proxy omitted ▮▮▮▮▮ Compl. ¶ 63, because the Proxy did in fact warn shareholders about potential dilution, *see* Proxy at 351. The Proxy's clear and repeated warnings about its exclusion of options and warrants in the exchange ratio formula and their dilutive impact on GTx shareholders' ownership render the alleged omissions immaterial.

Next, the alleged omission of the ▮▮▮▮▮ calculated by Aquilo is immaterial, because the Proxy disclosed adequate information for Plaintiffs to calculate dilution. *See Howell v. Mgmt. Assistance, Inc.*, 519 F. Supp. 83, 90 (S.D.N.Y. 1981), *aff'd*, 685 F.2d 424 (2d Cir. 1982) (holding that "hypothetical calculations which plaintiff claims should have been set forth was unnecessary" when "the facts were fully set forth in the proxy statement").

Plaintiffs allege that "reasonable GTx shareholders would have found it material to know the *calculated fully diluted ownership percentage.*" Pl. Opp. at 16. But the GTx shareholders' preference for having access to the Aquilo calculation does not render its omission material. The Proxy stated that its calculations excluded options and warrants, and it also gave GTx shareholders adequate information to evaluate, before voting, the diluted figure on their own.

The Proxy not only warned shareholders that its estimates excluded the dilutive impact of options and warrants, but also provided the number of outstanding GTx and Oncternal options and warrants and their estimated value. Def. Mem. at 16; Proxy at 149, 156, 174 (disclosing that Oncternal had a total of 6,868,251 stock options and 5,064,712 warrants outstanding, with an estimated combined value in April 2019 of $4.8 million). GTx shareholders could have estimated the dilutive impact of the options pool, standing alone, on their shares by doing basic math: "GTx shares / (Oncternal shares + GTx shares + options pool shares) = GTx shareholders' percentage of ownership of the post-merger combined company including the options pool," which yields an estimate of 20.2%, not far from the ▇▇▇ estimate that Plaintiffs alleged they actually received. Def. Mem. at 17 ("24,207,270 / (107,587,866 + 11,750,000) = 20.2%"); Proxy at 352, 374 (disclosing estimated shares of the combined company to be owned by GTx shareholders as 24,207,270); Proxy at 112, 374 (disclosing total shares of the combined company, absent exercise of options, as 107,587,866); Proxy at 214, 216 (disclosing the options pool shares as 11,750,000). That calculation, derived from information available in the Proxy, yields approximately the allegedly omitted figure. The disclosures are therefore adequate. *Bond Opportunity Fund*, 2003 WL 21058251, at *9 (finding disclosures sufficient where they "place a reasonable shareholder on inquiry notice as to the relevant facts").

Finally, Section 14(a) does not require disclosure of the exact figure calculated by GTx's financial advisor. *See Malon v. Franklin Fin. Corp.*, No. 14 Civ. 671, 2014 WL 6791611, at *6–7 (E.D. Va. Dec. 2, 2014) ("Stockholders are not entitled to the extensive financial data necessary to recreate the financial advisor's determination of fair value."); *see also Howell*, 519 F. Supp. at 90 (concluding that plaintiff's claim regarding the lack of "hypothetical pro forma cash flow statements" was "frivolous," because "calculations could be easily made . . . from the data in the proxy materials"). This omission, therefore, is not material, because it would not have "significantly altered the 'total mix' of information," informed GTx shareholders of the dilutive impact of options, or provided the information necessary to evaluate the impact. *Koppel*, 167 F.3d at 131 (internal quotation marks and citation omitted). Because Plaintiffs have not alleged a material omission or misrepresentation, they have failed to satisfy the first element of their Section 14(a) claim.

          2. Loss Causation

Plaintiffs also fail to meet the second element of their Section 14(a) claim—that the alleged omission caused the loss for which the Plaintiffs seek to recover damages—because they fail to adequately allege that they suffered any economic loss. The existence of a material misstatement or omission cannot by itself establish loss causation. "[L]oss causation . . . must be proven in the context of a private action" under Section 14(a). *Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000). Plaintiffs' allegations of economic loss are two-fold: (1) benefit-of-the-bargain damages, and (2) devaluation of GTx by the Merger. Pl. Opp. at 28–29. Plaintiffs, however, do not "present nonspeculative evidence of loss causation" for either allegation. *Grace*, 228 F.3d at 48.

First, Plaintiffs have not pleaded sufficient facts to allege damages under a benefit-of-the-bargain theory—that is, not receiving the value that was represented as coming to them. In federal securities law cases, plaintiffs are not entitled to benefit-of-the-bargain damages which are "unduly speculative and would result in a windfall unrelated to the loss they suffered." *Gray v. Wesco Aircraft Holdings, Inc.*, No. 19 Civ. 8528, 2020 WL 1904019, at *26 (S.D.N.Y. Apr. 16, 2020), *appeal docketed*, No. 20-1530 (2d Cir. May 6, 2020) (quoting *Barrows v. Forest Labs., Inc.*, 742 F.2d 54, 60 (2d Cir. 1984) (internal quotation marks omitted)); *see Kocourek v. Shrader*, 391 F. Supp. 3d 308, 333 (S.D.N.Y. 2019) (noting that damages must be based on the transaction actually struck). Here, Plaintiffs' claim for loss causation is based on the conclusory assertion that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Compl. ¶ 60. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See generally* Compl.; *see also* Def. Reply at 12–14, ECF No. 66; Proxy at 351. In fact, the post-merger press release, which Plaintiffs cited, showed that GTx shareholders retained approximately 22.5% interest in the combined company. Compl. ¶ 42 (citing June 7, 2019 Form 8-K Current Report filed with the SEC). Without evidence to the contrary, Plaintiffs cannot establish that GTx shareholders actually received less than they would otherwise have because of the alleged omission or misrepresentation. The speculative and conclusory assertion of economic loss does not meet the "nonspeculative evidence of loss causation" required by the Second Circuit. *Grace*, 228 F.3d at 48. Plaintiffs have, therefore, failed to adequately plead benefit-of-the-bargain damages.

Second, Plaintiffs have not pleaded sufficient facts to allege economic loss on the ground that the Merger undervalued GTx in light of its "independent growth prospects and significant strategic initiatives the Company accomplished prior to the consummation of the Merger." Compl. ¶ 71.  Plaintiffs argue that there was no reason to enter the Merger and suffer potential dilution, essentially asserting that their shares were "worth more."  Pl. Opp. at 29 (internal quotation marks and citation omitted).  To support this argument, Plaintiffs point to the nearly 33% drop in the combined company's stock price, from $8.40 per share on June 7, 2019 to $5.70 per share on September 11, 2019, claiming that "the market agrees that the Merger [c]onsideration inadequately valued GTx." Compl. ¶ 72.  However, Plaintiffs' argument is based on an "alternate reality where not only did the shareholders reject the merger," *Gray*, 2020 WL 1904019, at *26, but also where ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Compl. ¶ 71, not to mention other assumed internal and market forces.  Plaintiffs thus rely on a "hypothesis about what the parties would have done if the circumstances surrounding their transaction had been different." *Gray*, 2020 WL 1904019, at *26 (quoting *Barrows*, 742 F.2d at 60).  Plaintiffs do not, however, allege that a better deal was on the table or that they would have obtained more post-merger shares if they had voted against the Merger.  To permit Plaintiffs to recover on the "assumption that had the [c]ompany remained independent," GTx would have achieved a hypothetically higher stock value, would "improperly result in the windfall damages prohibited" by Second Circuit precedent.  *Id.* at *27–28 (citing *Barrows*, 742 F.2d at 60).  Plaintiffs have, therefore, failed to adequately plead loss causation.

Accordingly, Defendants' motion to dismiss the Section 14(a) claim is GRANTED.

B.  Section 20(a) Claim

"To establish a prima facie case of control person liability [under Section 20(a)], a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns. Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Plaintiffs' Section 20(a) claim must be dismissed.  Because the only underlying securities violation claim, under Section 14(a), has been dismissed, Plaintiffs have failed to state a claim of primary liability to which Section 20(a) control liability claim can attach.  *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 523 (S.D.N.Y. 2019); *Tiberius Capital, LLC v. PetroSearch Energy Corp.*, No. 09 Civ. 10270, 2011 WL 1334839, at *8 (S.D.N.Y. Mar. 31, 2011) ("Having failed to allege an underlying securities violation . . . [p]laintiffs['] control liability claim is defective.").

Accordingly, Defendants' motion to dismiss the Section 20(a) claim is GRANTED.

III.   Leave to Amend

Defendants also seek dismissal of the complaint with prejudice.  Def. Mem. at 3.  Plaintiffs oppose the request, and ask leave to amend.  Pl. Opp. at 29.  Rule 15 of the Federal Rules of Civil Procedure instructs a court to "freely give leave" to amend "when justice so requires," Fed. R. Civ. P. 15(a)(2), but amendment "is not warranted absent some indication as to what [plaintiffs] might add to their complaint in order to make it viable."  *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004) (internal quotation marks and citation omitted).

Plaintiffs have not suggested what new information or allegation they would include in an amended complaint to render their claims viable. Plaintiffs may, however, file a motion for leave to amend their complaint within 21 days of this order.

Accordingly, Defendants' request to dismiss the complaint with prejudice is DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the complaint is GRANTED.

By **July 14, 2020**, Plaintiffs shall file any request for leave to amend the complaint.

The Clerk of Court is directed to terminate the motions at ECF Nos. 52 & 53.

SO ORDERED.

Dated: June 23, 2020
New York, New York

_____
ANALISA TORRES
United States District Judge